UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| APPROXIMATELY 763,699.0201 | ) |
| USDT TOKENS, | ) |
| | ) |
| APPROXIMATELY 1,222,451.617246 | ) |
| USDT TOKENS, AND | ) |
| | ) |
| APPROXIMATELY 202,039.787104 | ) |
| USDT TOKENS, | ) |
| | ) |
| | ) |
| Defendants. | ) |

## VERIFIED COMPLAINT FOR CIVIL FORFEITURE *IN REM*

The United States of America, by ANDREW S. BOUTROS, United States

Attorney for the Northern District of Illinois, for its verified complaint against the

above-named defendant properties and in accordance with Supplemental Rule G(2)

of the Federal Rules of Civil Procedure alleges as follows:

## NATURE OF THE ACTION

1.      This is a civil action brought by 18 U.S.C. §§ 981(a)(1)(A) and

981(a)(1)(C) for forfeiture *in rem* of the defendant property. The United States seeks

forfeiture of the properties described in paragraph 3 below, which constitute proceeds

or property traceable to proceeds of a money laundering offense or offenses, and were

involved in the commission of a money laundering offense or offenses, in violation of

18 U.S.C. § 1956. In addition, under 18 U.S.C. § 981(a)(1)(C), with cross-references to 18 U.S.C. §§ 1956(c)(7) and 1961(1), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of" fraud are subject to civil forfeiture to the United States.

2.     This complaint is verified by the attached Verification of Federal Bureau of Investigation Special Agent Dustin Gourley ("SA Gourley"), which is fully incorporated herein.

## THE DEFENDANT PROPERTY

3.     The Defendant *in rem* consists of approximately 2,188,190.42445 Tether ("USDT Tokens") formerly held in cryptocurrency accounts identified by the following Tether deposit addresses:

      (a)     TL2NYLDRWiHN1rgjFbLxHinsxcTpVTWLx7 (Subject Asset #1)

      (b)     TDEriGM2S3RxhBzGda2dgNE8NhVB4VxMuB (Subject Asset #2)

      (c)     TYjCLPXju4hGsmjdNDzLcrmQc1tWnt8tfc (Subject Asset #3)

(hereinafter the defendant property or "Subject Assets").

4.     The Subject Assets have been seized pursuant to a seizure warrant 25M11, dated January 27, 2025, issued by Magistrate Judge Keri L. Holleb Hotaling in the Northern District of Illinois and are in the custody of the Federal Bureau of Investigation.

## JURISDICTION AND VENUE

5.     This court has jurisdiction over this action pursuant to 28 U.S.C. § 1345

2

and 28 U.S.C. § 1355(a).

6. Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1) because the acts or omissions giving rise to the forfeiture occurred at least in part within this district.

## BASIS FOR FORFEITURE

7. The defendant property is subject to forfeiture under 18 U.S.C. § 981(a)(1)(C) because it constitutes or was derived from proceeds traceable to an offense constituting "specified unlawful activity" – as defined in 18 U.S.C. § 1956(c)(7), with reference to 18 U.S.C. § 1961(1) – namely, money laundering, committed in violation of 18 U.S.C. § 1956.

8. The defendant property is also subject to forfeiture under 18 U.S.C. § 981(a)(1)(A) because it was involved in, or is traceable to funds involved in, money laundering transactions in violation of 18 U.S.C. § 1956.

## BACKGROUND ON CRYPTOCURRENCY

9. Cryptocurrency, a type of virtual currency, is a decentralized, peer-to-peer, network-based medium of value or exchange that may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies. Examples of cryptocurrency are Bitcoin, Litecoin, and Ether. Cryptocurrency can exist digitally on the internet, in an electronic storage device, or in cloud-based servers. Although not usually stored in any physical form, public and private keys (described below) used to transfer cryptocurrency from one person or place to another can be printed or written on a piece of paper or other tangible object.

3

Cryptocurrency can be exchanged directly person to person, through a cryptocurrency exchange, or through other intermediaries. Generally, cryptocurrency is not issued by any government, bank, or company; it is instead generated and controlled through computer software operating on a decentralized peer-to-peer network. Most cryptocurrencies have a "blockchain," which is a distributed public ledger, run by the decentralized network, containing an immutable and historical record of every transaction.[1] Cryptocurrency, itself, it not illegal in the United States.

10.     Bitcoin[2] ("BTC") is a type of cryptocurrency. Payments or transfers of value made with bitcoin are recorded in the Bitcoin blockchain and thus are not maintained by any single administrator or entity. As mentioned above, individuals can acquire bitcoin through exchanges (i.e., online companies which allow individuals to purchase or sell cryptocurrencies in exchange for fiat currencies or other cryptocurrencies), bitcoin ATMs, or directly from other people.

11.     Ether ("ETH") is a cryptocurrency that is open source, public, has a blockchain, and is distributed on a platform that uses "smart contract" technology. The public ledger is the digital trail of the Ethereum blockchain, which allows anyone to track the movement of ETH. Smart contracts allow developers to create markets, store registries of debts, and move funds in accordance with the instructions provided

---

[1] Some cryptocurrencies operate on blockchains that are not public and operate in such a way to obfuscate transactions, making it difficult to trace or attribute transactions.

[2] Since Bitcoin is both a cryptocurrency and a protocol, capitalization differs. Accepted practice is to use "Bitcoin" (singular with an uppercase letter B) to label the protocol, software, and community, and "bitcoin" (with a lowercase letter b) to label units of the cryptocurrency. That practice is adopted here.

4

in the contract's code, without any type of middleman or counterparty controlling a desired or politically motivated outcome, all while using the Ethereum blockchain protocol to maintain transparency. Smart contract technology is one of Ethereum's distinguishing characteristics and an important tool for companies or individuals executing trades on the Ethereum blockchain. When engaged, smart contracts automatically execute according to the terms of the contract written into lines of code. A transaction contemplated by a smart contract occurs on the Ethereum blockchain and is both trackable and irreversible.

12. Stablecoins are a type of virtual currency whose value is pegged to a commodity's price (such as gold), to a fiat currency (such as the U.S. dollar), or to a different virtual currency. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives. Some stablecoins are issued (i.e., created or minted) by a central authority (e.g., a company or other entity) that centrally manages the smart contracts and treasury for the stablecoin.

13. Tether ("USDT") is a stablecoin pegged to the U.S. dollar. Tether Limited ("Tether") is the company that manages the smart contracts and treasury (i.e., reserve assets) for USDT. Because Tether manages the smart contracts for USDT, they are able to blacklist some addresses containing USDT. For example, Tether is able to blacklist addresses holding USDT on the Ethereum network, rendering those funds inaccessible to whomever controls the private keys to the blacklisted addresses. In the instant case, at the request of law enforcement, Tether

voluntarily froze/blacklisted the addresses associated with the SUBJECT ASSETS and continued to do so until they received the aforementioned warrant.

14. Individuals can send and receive cryptocurrencies online using many types of electronic devices, including laptop computers and smartphones. Even though the public addresses of those engaging in cryptocurrency transactions are recorded on a blockchain, the identities of the individuals or entities behind the public addresses are not recorded on these public ledgers. If, however, an individual or entity is linked to a public address, it may be possible to determine what transactions were conducted by that individual or entity. Bitcoin transactions are therefore sometimes described as "pseudonymous," meaning that they are partially anonymous. And while it's not completely anonymous, bitcoin allows users to transfer funds more anonymously than would be possible through traditional banking and financial systems.

15. Cryptocurrency is stored in a virtual account called a wallet. Wallets are software programs that interface with blockchains and generate and/or store public and private keys used to send and receive cryptocurrency. A public key or address is akin to a bank account number, and a private key is akin to a PIN number or password that allows a user the ability to access and transfer value associated with the public address or key. To conduct transactions on a blockchain, an individual must use the public address (or "public key") and the private address (or "private key"). A public address is usually represented as a case-sensitive string of letters and numbers, 26–90 characters long, often depending on the cryptocurrency protocol.

6

Each public address is controlled and/or accessed with the use of a unique corresponding private key—the cryptographic equivalent of a password or PIN— needed to access the address. Only the holder of an address's private key can authorize any transfers of cryptocurrency from that address to another cryptocurrency address.

16. Exchangers and users of cryptocurrencies store and transact their cryptocurrency in a number of ways, as wallet software can be housed in a variety of forms, including on a tangible, external device ("hardware wallet"), downloaded on a PC or laptop ("desktop wallet"), with an internet-based cloud storage provider ("online wallet"), as a mobile application on a smartphone or tablet ("mobile wallet"), printed public and private keys ("paper wallet"), and as an online account associated with a cryptocurrency exchange. Because these desktop, mobile, and online wallets are electronic in nature, they are located on mobile devices (e.g., smartphones or tablets) or at websites that users can access via a computer, smartphone, or any device that can access the internet. Moreover, hardware wallets are located on some type of external or removable media device, such as a USB thumb drive or other commercially available device designed to store cryptocurrency (e.g. Trezor, Keepkey, or Nano Ledger). In addition, paper wallets contain an address and a QR code[3] with the public and private key embedded in the code. Paper wallet keys are not stored digitally. Wallets can also be backed up into, for example, paper printouts, USB drives, or CDs, and accessed through a "recovery seed" (random words strung

---

[3] A QR code is a matrix barcode that is a machine-readable optical label.

together in a phrase) or a complex password. Additional security safeguards for cryptocurrency wallets can include two-factor authorization (such as a password and a phrase).

17. "Exchangers" and "exchanges" are individuals or companies that exchange bitcoin or other cryptocurrencies for other currencies, including U.S. dollars. According to the United States Department of Treasury, Financial Crimes Enforcement Network ("FinCEN") Guidance issued on March 18, 2013, virtual currency administrators and exchangers, including an individual exchanger operating as a business, are considered money services businesses.[4] Such exchanges and exchangers are required to register with FinCEN and have proper state licenses (if required under applicable state law). Registered money transmitters are required by law to follow Bank Secrecy Act anti-money laundering ("AML") regulations, "Know Your Customer" ("KYC") protocols, and other verification procedures similar to those employed by traditional financial institutions. For example, FinCEN-registered cryptocurrency exchangers often require customers who want to open or maintain accounts on their exchange to provide their name, address, phone number, and the full bank account and routing numbers that the customer links to an exchange account. As a result, there is significant market demand for illicit cryptocurrency-for-fiat-currency exchangers, who lack AML or KYC protocols and often also advertise their ability to offer customers anonymity. These illicit exchangers routinely

---

[4] *See* "Application of FinCEN's Regulations to Person Administering, Exchanging, or Using Virtual Currencies," *available at* https://www.fincen.gov/resources/statutes-regulations/guidance/application-fincens-regulations-persons-administering.

exchange fiat currency for cryptocurrencies by meeting customers in person or by shipping cash through the mail. Due to the illicit nature of these transactions and their customers' desire for anonymity, such exchangers are frequently able to charge a higher exchange fee, often as high as 9–10% (in contrast to registered and Bank Secrecy Act-compliant exchangers, who may charge fees as low as 1–2%).

18. As referenced above, in this matter, the SUBJECT ASSETS are associated with virtual currency addresses that exist on the Ethereum network. Pursuant to seizure warrant 25M11, on January 27, 2025, Tether "burned" or destroyed the addresses that comprised the Subject Assets (and by extension the USDT tokens associated with them). Tether then reissued the equivalent amount of USDT tokens associated with each address and transferred that USDT to a government-controlled wallet.

## FACTUAL BACKGROUND

19. On October 27, 2024, in the Chicago area, FAN ZHANG and other individuals ("the kidnappers") kidnapped four victims ("Victims A, B, C, and D") for ransom and held them until November 1, 2024, when all victims were released.[5] The kidnappers demanded that the father of Victim A, and later, Victim A him/herself, send cryptocurrency to the kidnappers in return for the safe release of Victims A-D. While the kidnappers were holding Victims A-D for ransom, the kidnappers forced

---

[5] On December 13, 2024, ZHANG, ZEHAUN WEI, HUAJING YAN, SHENGNAN JIANG, SHIQIANG LIAN, and YE CAO were charged by complaint with kidnapping, in violation of 18 U.S.C. § 1201 (N.D. Ill. No. 24 CR 595). An indictment charging those same individuals with kidnapping conspiracy, pursuant to 18 U.S.C. § 1201(c), and kidnapping, pursuant to 18 U.S.C. § 1201(a)(1), was returned on February 24, 2025.

Victim A to transfer cryptocurrency to wallets controlled by at least one of the kidnappers. After gaining access to Victim A's accounts, the kidnappers conducted independent transfers. Through these combined transactions, the kidnappers obtained a total of approximately $15,000,000 in cryptocurrency assets from Victim A. The **SUBJECT ASSETS** are a portion of the cryptocurrency assets that the kidnappers obtained from Victim A as ransom.

20. Victim A provided FBI with information regarding the two cryptocurrency wallets that the kidnappers demanded Victim A transfer his/her cryptocurrency to – Subject Wallet 1 and Subject Wallet 2. According to Victim A, Victim A maintained a Robinhood[6] account in order to conduct cryptocurrency transactions, which was linked to Victim A's bank accounts to fund the purchases. At some point, Victim A provided the kidnappers with information that enabled them to access his Robinhood account to conduct additional transactions, and allowed them to access Victim A's bank accounts in order to confirm the additional transactions.

*Identification of Subject Assets*

21. Records from Victim A indicate that the kidnappers transferred funds from Victim A's Robinhood account to a Bitcoin address (the "Bitcoin Address").

22. Based on preliminary blockchain analysis conducted by the FBI, 59.99 BTC were transferred from Victim A's Robinhood account to the Bitcoin Address

---

[6] In my training and experience, Robinhood is a registered broker dealer which allows people to invest in stocks, and buy and sell cryptocurrency, among other financial offerings.

between October 29, 2024 and October 31, 2024. According to blockchain analysis, the balance of the Bitcoin Address prior to these transactions was 0 BTC.

23.     As detailed below, approximately 48.90 of the 59.99 BTC from Victim A was transferred from the Bitcoin Address through a series of intermediary addresses to three Tether addresses: TL2NYLDRWiHN1rgjFbLxHinsxcTpVTWLx7 (**SUBJECT ASSET #1**), TDEriGM2S3RxhBzGda2dgNE8NhVB4VxMuB (**SUBJECT ASSET #2**), and TYjCLPXju4hGsmjdNDzLcrmQc1tWnt8tfc (**SUBJECT ASSET #3**):

   a) From October 30, 2024 to October 31, 2024, approximately 34.00 BTC were transferred from the Bitcoin Address to private address 1C3WBgU2h6RtGMRsYDQu4Qz6KzdYSHpTzF (hereinafter 1C3WBgU2 INTERMEDIARY ADRESS #1). According to blockchain analysis, the balance of 1C3WBgU2 INTERMEDIARY ADDRESS #1 prior to these transactions was 0 BTC.

   b) On October 31, 2024, approximately 10 BTC were transferred from the Bitcoin Address to private address bc1qypzqy69nz5zk3lktc62y7x0mxtkqs3pewzpext (hereinafter bc1qypzq INTERMEDIARY ADDRESS #2). According to blockchain analysis, the balance of bc1qypzq INTERMEDIARY ADDRESS #2 prior to this transaction was 0 BTC.

c) On October 31, 2024, approximately 10 BTC were transferred from bc1qypzq INTERMEDIARY ADDRESS #2 to 1C3WBgU2 INTERMEDIARY ADDRESS #1. Therefore, as of October 31, 2024, the total amount of BTC in 1C3WBgU2 INTERMEDIARY ADDRESS #1 was approximately 44 BTC.

d) On November 1, 2024, approximately 4.90 BTC were transferred from the Bitcoin Address to private address 17DqtueqF5NoGqcv46dk4LR8vdFFVxuSA2 (hereinafter 17Dqtueq INTERMEDIARY ADDRESS #3). According to blockchain analysis, the balance of 17Dqtueq INTERMEDIARY ADDRESS #3 prior to this transaction was 0 BTC. Therefore, as of November 1, 2024, the total amount of BTC in 17Dqtueq INTERMEDIARY ADDRESS #3 was approximately 4.90 BTC.

24. As detailed below, approximately 28.90 BTC of the 48.90 BTC transferred from the Bitcoin Address was transferred through intermediary addresses to Individual 1's account at Bitget, a cryptocurrency exchange, converted to 1,990,659 USDT,[7] and subsequently transferred from Individual 1's Bitget account through a series of intermediary addresses to **SUBJECT ASSET #2**.

a) From November 2, 2024 to November 3, 2024, approximately 24 BTC were transferred from 1C3WBgU2 INTERMEDIARY

---

[7] On November 1, 2024, approximately 785,316 USDT was sent from Individual 1's Bitget account through a series of intermediary addresses to **SUBJECT ASSET #2**. These funds originated from Victim A's Robinhood account and were transferred to

ADDRESS #1 to private address bc1q2qcfjqzrgr80v44lhlf0ux6jwyy8980nn4tlgw (hereinafter bc1q2qcf INTERMEDIARY ADDRESS #4), leaving 20 BTC remaining in 1C3WBgU2 INTERMEDIARY ADDRESS #1. According to blockchain analysis, the balance of bc1q2qcf INTERMEDIARY ADDRESS #4 prior to these transactions was 0 BTC.

b) On November 2, 2024, approximately 4.90 BTC were transferred from 17Dqtueq INTERMEDIARY ADDRESS #3 to bc1q2qcf INTERMEDIARY ADDRESS #4, leaving 0 BTC remaining in 17Dqtueq INTERMEDIARY ADDRESS #3. With these two transfers, there was approximately 28.90 BTC in bc1q2qcf INTERMEDIARY ADDRESS #4.

c) On November 2, 2024, approximately 3 BTC of that 28.90 BTC were transferred from bc1q2qcf INTERMEDIARY ADDRESS #4 to private address bc1qj4xvyjm92sau6hajenvugallj23hl0rzmdt3da (hereinafter bc1qj4xv INTERMEDIARY ADDRESS #5), leaving 25.90 BTC in bc1q2qcf INTERMEDIARY ADDRESS #4. On the same date,

---

0x1C46b7a9877f4a84519D939056aBa520b448174C (Subject Wallet 4). Utilizing the first in, first out (FIFO) tracing methodology, these funds were fully withdrawn prior to Tether freezing **SUBJECT ASSET #2**. Therefore, these proceeds were not included in the flow of funds described above.

approximately 3 BTC were transferred from bc1qj4xv INTERMEDIARY ADDRESS #5 to private address 126Lq23DzbVUNvGEFh4sYTZ4JxBJs2dUa2 (hereinafter 126Lq23D INTERMEDIARY ADDRESS #6). According to blockchain analysis, the balance of bc1qj4xv INTERMEDIARY ADDRESS #5 and 126Lq23D INTERMEDIARY ADDRESS #6 prior to these transactions was 0 BTC each.

d) From November 2, 2024 to November 3, 2024, the remaining approximately 25.90 BTC were transferred from bc1q2qcf INTERMEDIARY ADDRESS #4 to 126Lq23D INTERMEDIARY ADDRESS #6.

e) From November 2, 2024 to November 3, 2024, approximately 28.90 BTC were transferred from 126Lq23D INTERMEDIARY ADDRESS #6 to Individual 1's Bitget account.

f) According to Bitget's records, the balance of Individual 1's account prior to these transactions was negative (4,615.65) in USDT.

g) From November 2, 2024 to November 3, 2024, approximately 28.90 BTC were traded for approximately 1,990,659 USDT and was transferred from Individual 1's Bitget account to private address TP85NG7KfpQRGbd9M2e5ZS3E1Bk4fdhXvX (hereinafter TP85NG7K INTERMEDIARY ADDRESS #7).

14

According to blockchain analysis, the balance of TP85NG7K INTERMEDIARY ADDRESS #7 prior to these transactions was 1.88 USDT.

h) From November 2, 2024 to November 3, 2024, approximately 1,961,824 USDT was transferred from TP85NG7K INTERMEDIARY ADDRESS #7 to private address TAyx2EjW69miZdhn9TQWabXbCrpb4QbDWg (hereinafter TAyx2EjW INTERMEDIARY ADDRESS #8). According to blockchain analysis, the balance of TAyx2EjW INTERMEDIARY ADDRESS #8 prior to these transactions was 5,720 USDT.

i) From November 2, 2024 to November 3, 2024, approximately 1,911,045 USDT was transferred from TAyx2EjW INTERMEDIARY ADDRESS #8 to private address TJf3VMvRSQ6mPmPaNVcDhVLeiHKNooQQqQ (hereinafter TJf3VMvR INTERMEDIARY ADDRESS #9). According to blockchain analysis, the balance of TJf3VMvR INTERMEDIARY ADDRESS #9 prior to these transactions was 1,667,308 USDT.

j) On November 7, 2024, approximately 3,231,881 USDT was transferred from TJf3VMvR INTERMEDIARY ADDRESS #9 to **SUBJECT ASSET #2**. According to blockchain analysis, the

15

balance of **SUBJECT ASSET #2** prior to this transaction was 0 USDT.

k) On November 27, 2024, Tether froze **SUBJECT ASSET #2** when the remaining balance was approximately 1,031,882 USDT.

l) Between November 7, 2024 and November 23, 2024, approximately 2,200,000 USDT was withdrawn from **SUBJECT ASSET #2**. Utilizing the first in, first out (FIFO) tracing methodology, the opening balance in TJf3VMvR INTERMEDIARY ADDRESS #9 of 1,667,308 USDT that was partially included in the 3,231,881 USDT amount transferred to **SUBJECT ASSET #2** was completely depleted prior to Tether freezing the account, leaving only proceeds from Victim A remaining in **SUBJECT ASSET #2**. There were no other deposits made into **SUBJECT ASSET #2** during the period November 7, 2024 to November 27, 2024. However, as described in paragraph 25(j), below, between December 7, 2024 and December 8, 2024, an additional approximately 190,570 USDT of Victim A's funds were sent to **SUBJECT ASSET #2** from an intermediary address, increasing the total frozen

16

assets associated with **SUBJECT ASSET #2** to approximately 1,222,451 USDT.

25.     As detailed below, approximately 10 BTC originally from the Bitcoin Address were moved through intermediary addresses to Individual 2's Bitget account, converted to 998,333 USDT, and then transferred from Individual 2's Bitget account through a series of intermediary addresses to **SUBJECT ASSET #1** and **SUBJECT ASSET #2**.

a)  On November 7, 2024, an additional approximately 10 BTC originally from the Bitcoin Account were transferred from 1C3WBgU2 INTERMEDIARY ADDRESS #1 to private address 1J9wE3aH2nZUxHuRBe1hycbr8x64o8cUp8 (hereinafter 1J9wE3aH INTERMEDIARY ADDRESS #10). As described above in paragraph 24(a), 1C3WBgU2 INTERMEDIARY ADDRESS #1 had approximately 20 BTC remaining after the above-mentioned transfers in paragraph 24.

b)  According to blockchain analysis, the balance of 1J9wE3aH INTERMEDIARY ADDRESS #10 prior to this transaction was 0 BTC.

c)  On November 16, 2024, approximately 10 BTC were transferred from 1J9wE3aH INTERMEDIARY ADDRESS #10 to private address bc1q82pcpu3t7rc3m69j3ughxzwpq6n6qkfw9uk38q (hereinafter

17

bc1q82pc INTERMEDIARY ADDRESS #11). According to blockchain analysis, the balance of bc1q82pc INTERMEDIARY ADDRESS #11 prior to these transactions was 0 BTC.

d) On December 7, 2024, approximately 2 BTC were transferred from bc1q82pc INTERMEDIARY ADDRESS #11 to private address bc1qlththqehhsl076l8ar3ltf2s6j7ekgrsarll8g (hereinafter bc1qltht INTERMEDIARY ADDRESS #12). According to blockchain analysis, the balance of bc1qltht INTERMEDIARY ADDRESS #12 prior to this transaction was 0 BTC.

e) On December 8, 2024, approximately 8 BTC were transferred from bc1q82pc INTERMEDIARY ADDRESS #11 to private address bc1pygykuh0kddj0nhej77plk5t6dmgl0zuswmvaffzz7ncz8p4xmt0s4gcqc7 (hereinafter bc1pygyku INTERMEDIARY ADDRESS #13). According to blockchain analysis, the balance of bc1pygyku INTERMEDIARY ADDRESS #13 prior to this transaction was 0 BTC.

f) On December 8, 2024, approximately 8 BTC were transferred from bc1pygyku INTERMEDIARY ADDRESS #13 to private address bc1quru3zlv6j5wav0k200t54u8h9tp9pg976ccsxg (hereinafter bc1quru3 INTERMEDIARY ADDRESS #14).

According to blockchain analysis, the balance of bc1quru3 INTERMEDIARY ADDRESS #14 prior to this transaction was 0 BTC.

g) From December 7, 2024 to December 8, 2024, approximately 2 BTC were transferred from bc1qltht INTERMEDIARY ADDRESS #12 and approximately 8 BTC were transferred from bc1quru3 INTERMEDIARY ADDRESS #14 to private address 1JXK1mQNCyUt4BMGtCABTKEdh2zakziGiw (hereinafter 1JXK1mQN INTERMEDIARY ADDRESS #15). According to blockchain analysis, the balance of 1JXK1mQN INTERMEDIARY ADDRESS #15 prior to these transactions was 0 BTC.

h) From December 7, 2024 to December 8, 2024, approximately 10 BTC were transferred from 1JXK1mQN INTERMEDIARY ADDRESS #15 to Individual 2's Bitget account. According to Bitget's records, the balance of Individual 2's account prior to these transactions was (11,641) in USDT.

i) On December 7, 2024, approximately 2 BTC from Individual 2's Bitget account were traded for 198,922 USDT and transferred from Individual 2's Bitget account to private address TYB2nemg9gtCkg2UDs22R8Wgn5HibEbSbw (hereinafter TYB2nemg INTERMEDIARY ADDRESS #16). According to

19

blockchain analysis, the balance of TYB2nemg INTERMEDIARY ADDRESS #16 prior to this transaction was 0 USDT.

j)  From December 7, 2024 to December 8, 2024, approximately 190,570 USDT was sent from TYB2nemg INTERMEDIARY ADDRESS #16 to **SUBJECT ASSET #2**.

k)  On December 8, 2024, the remaining approximately 8 BTC in Individual 2's Bit**g**et account were traded for 799,411 USDT and transferred from Individual 2's Bitget account to private address TQzYCGVSJ49H9MNfA9EApTNPT7NkD4cGXF (hereinafter TQzYCGVS INTERMEDIARY ADDRESS #17). According to blockchain analysis, the balance of TQzYCGVS INTERMEDIARY ADDRESS #17 prior to these transactions was 0 USDT.

l)  On December 8, 2024, approximately 763,689 USDT was transferred from TQzYCGVS INTERMEDIARY ADDRESS #17 to private address TNbZsfnSQnhrJqCzYqvpwgMitMsr2eWWHC (hereinafter TNbZsfnS INTERMEDIARY ADDRESS #18). According to blockchain analysis, the balance of TNbZsfnS

INTERMEDIARY ADDRESS #18 prior to these transactions was 0 USDT.

m) On December 8, 2024, approximately 763,699 USDT was transferred from TNbZsfnS INTERMEDIARY ADDRESS #18 to **SUBJECT ASSET #1**. According to blockchain analysis, the balance of **SUBJECT ASSET #1** prior to these transactions was 0 USDT.

n) On December 9, 2024, Tether froze **SUBJECT ASSET #1** when the balance was 763,699 USDT.

26. As detailed below, approximately 1.76 BTC from the Bitcoin Account was transferred through intermediary addresses to Individual 3's account at Gate.io, another cryptocurrency exchange, and converted to 182,606 USDT before being transferred from Individual 3's Gate.io account through a series of intermediary addresses to **SUBJECT ASSET #3**.

a) On November 2, 2024, approximately 10 BTC originally from the Bitcoin Account were transferred from 1C3WBgU2 INTERMEDIARY ADDRESS #1 to private address bc1qcrg7lnndk9uly3d0c7pvak8m7n3ak9t4l2pk2q (hereinafter bc1qcrg7 INTERMEDIARY ADDRESS #19). According to

blockchain analysis, the balance of bc1qcrg7 INTERMEDIARY ADDRESS #19 prior to this transaction was 0 BTC.

b) From December 12, 2024 to December 13, 2024, approximately 1.46 BTC were transferred from bc1qcrg7 INTERMEDIARY ADDRESS #19 to private address bc1qrwgh6zluhdmt2khy9np79kj0wx3v8mwvccd3f9 (hereinafter bc1qrwgh INTERMEDIARY ADDRESS #20). According to blockchain analysis, the balance of bc1qrwgh INTERMEDIARY ADDRESS #20 prior to these transactions was 0 BTC.

c) On December 13, 2024, approximately 0.41 BTC were transferred from bc1qrwgh INTERMEDIARY ADDRESS #20 to private address bc1q9uwwp76cday73x0ppt2xtvdasum9cr3wfs99ma (hereinafter bc1q9uww INTERMEDIARY ADDRESS #21). According to blockchain analysis, the balance of bc1q9uww INTERMEDIARY ADDRESS #21 prior to this transaction was 0 BTC.

d) On December 14, 2024, approximately 0.41 BTC were transferred from bc1q9uww INTERMEDIARY ADDRESS #21 to Individual 3's Gate.io account. According to Gate.io's records,

the balance of Individual 3's account prior to these transactions was (189) USDT.

e) From December 15, 2024 to December 17, 2024, approximately 2.35 BTC were transferred from bc1qcrg7 INTERMEDIARY ADDRESS #19 to private address bc1qhgu4u7n56vkfgr4g08m9f7p7wzruc3nxvxzx4g (hereinafter bc1qhgu4 INTERMEDIARY ADDRESS #22). According to blockchain analysis, the balance of bc1qhgu4 INTERMEDIARY ADDRESS #22 prior to these transactions was 0 BTC.

f) From December 15, 2024 to December 16, 2024, approximately 1.35 BTC were transferred from bc1qhgu4 INTERMEDIARY ADDRESS #22 to Individual 3's Gate.io account.

g) From December 14, 2024 to December 16, 2024, approximately 1.76 BTC in Individual 3's Gate.io account were traded to approximately 182,606 USDT in Individual 3's Gate.io account. From December 15, 2024 to December 16, 2024, deposits of 600 UNI[8] that do not appear to be directly related to Victim A's Robinhood account were traded in Individual 3's Gate.io

---

[8] UNI coin is the governance token of Uniswap and built on the Ethereum blockchain.

account to approximately 10,109 USDT in Individual 3's Gate.io account.

h) From December 14, 2024 to December 16, 2024, approximately 223,123 USDT was transferred from Individual 3's Gate.io account to **SUBJECT ASSET #3**.

i) According to blockchain analysis, the balance of **SUBJECT ASSET #3** prior to these transactions was 23,279 USDT.

j) Between December 14, 2024 and December 15, 2024, a total of 190,000 USDT was withdrawn from **SUBJECT ASSET #3**

k) On December 16, 2024, Tether froze **SUBJECT ASSET #3** when the balance was 156,079 USDT. Thereafter, from December 16, 2024 to December 17, 2024, approximately 45,961 USDT in additional funds were deposited into **SUBJECT ASSET #3**. These funds were not directly traceable to Victim A's Robinhood account, but were commingled with the victim proceeds in the same account, which was frozen for

withdrawals but still accepting deposits. The total amount frozen with **SUBJECT ASSET #3** is therefore 202,039 USDT.

l) From December 14, 2024 to December 17, 2024, 186,463 USDT in non-proceeds[9] and 182,297 USDT of Victim A proceeds were deposited into **SUBJECT ASSET #3**.

27. As of January 13, 2025, **SUBJECT ASSET #1** contained approximately 763,699 USDT; **SUBJECT ASSET #2** contained approximately 1,222,451 USDT; and **SUBJECT ASSET #3** contains approximately 202,039 USDT.

28. On December 8, 2024, Tether contacted the FBI to provide information that an individual utilizing e-mail address "90t.tracy@gmail.com" had contacted Tether on December 8, 2024, and claimed ownership of **SUBJECT ASSET 2**. As discussed below, 90t.tracy@gmail.com is used by ZHANG.

29. On December 11, 2024, Tether contacted the FBI to provide information that an individual utilizing e-mail address "1125852288@qq.com" had contacted Tether on December 11, 2024, claiming ownership of **SUBJECT ASSET 2**.

30. Law enforcement reviewed records received pursuant to subpoenas and learned that the email address 1125852288@qq.com is associated with a known associate of ZHANG.

*Additional Reference to "90t.tracy@gmail.com"*

31. Law enforcement received records from n.exchange, a cryptocurrency exchange, based on initial transactions conducted by the kidnappers. Records from

---

[9] Non-proceeds are funds not directly traceable to Victim A's Robinhood account.

n.exchange indicated the transactions associated with n.exchange were conducted associated with order ID OVKRML and email address 90t.tracy@gmail.com, which is the same email address referenced above in paragraph 28. The following message was sent by the user:

> tracy <90t.tracy@gmail.com>
> to: support@n.exchange
>
> Dear N Exchange,
> I am reaching out on the advice of the Exodus support team regarding my recent transaction (ID: OVKRML), which involves a BTC to USDT (TRC-20) swap. I would appreciate any assistance or updates regarding the status of this transaction.
> Please let me know if further details are required to facilitate this request.
> Thank you for your support.
> Best regards
>
> 3h

32.     n.exchange also provided information about the user for Know-Your-Customer (KYC) purposes, including a picture of a Southern California Edison bill for "Zhang, Fan," with his current address and a picture of Fan ZHANG's Chinese passport issued in June 2024. n.exchange also provided two selfies taken by the user, who appears to be ZHANG, based on a comparison with ZHANG's passport photo.

33.     Law enforcement received records from Google regarding "90t.tracy@gmail.com," which included a recovery SMS phone number of 626-567-0055.

34. Law enforcement reviewed financial records from MGM Resorts, which documented financial transactions conducted by Fan Zhang between July 4, 2023 and September 14, 2023. Information from MGM Resorts attributed the telephone number 626-567-0055 to ZHANG.

## WARRANT FOR ARREST IN REM

38. Upon the filing of this complaint, the plaintiff requests that the Court issue an arrest warrant in rem pursuant to Supplemental Rule G(3)(b), which the plaintiff will execute upon the defendant property pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

## CLAIM FOR RELIEF

39. The plaintiff repeats and incorporates by reference the paragraphs above.

40. By the foregoing and other acts, the defendant property constitutes or was derived from proceeds traceable to specified unlawful activity, namely, money laundering, committed in violation of 18 U.S.C. § 1956, and is therefore subject to forfeiture to the United States of America under 18 U.S.C. § 981(a)(1)(C) with cross-references to 18 U.S.C. §§ 1956(c)(7) and 1961(1).

41. By the foregoing and other acts, the defendant property was involved in, or is traceable to funds involved in, money laundering transactions in violation of 18 U.S.C. § 1956 and is therefore subject to forfeiture to the United States of America under 18 U.S.C. § 981(a)(1)(A).

27

WHEREFORE, the United States of America requests:

a.     the defendant property be proceeded against for forfeiture and condemnation;

b.     due notice be given to all interested parties to appear and show cause why the forfeiture should not be decreed; and

c.     this court adjudge and decree that the defendant property be forfeited to the United States and disposed of according to law.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By:   */s/ Jennifer Aronoff*
JENNIFER ARONOFF
Assistant United States Attorney
219 South Dearborn Street, Rm. 500
Chicago, Illinois 60604
(312) 353-5300

## VERIFICATION

1.     I, Dustin Gourley, hereby verify and declare under penalty of perjury, that I am a Special Agent with the Federal Bureau of Investigation and have been so employed since approximately 2012. As part of my duties as an FBI Special Agent, I investigate criminal violations relating to white collar crimes, including mail, wire, and bank fraud. In addition, I have received training on how people use computers to commit crimes and the law enforcement techniques that can be used to investigate and disrupt such activity.  I have participated in federal search and seizure warrants to include warrants pertaining to the seizure of digital information and digital assets.

2.     I have read the foregoing Verified Complaint in this matter and the facts alleged are true and correct to the best of my knowledge and belief based upon my own personal knowledge as well as information I have received from other agents, persons and documents, and it does not include each and every fact known to me concerning this investigation.

I hereby verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 31st day of March 2026.


Dustin Gourley
Special Agent
Federal Bureau of Investigation

29